# EXHIBIT D

# Operating Agreement
## of
## Trolley Pub of North Carolina, LLC

THIS OPERATING AGREEMENT (these "**Articles**") is made as of the 29th day of February, 2012 by and among the signatories identified on the signature pages hereto.

IN CONSIDERATION OF the mutual promises of the parties hereto and other good and valuable consideration, receipt and adequacy of which is hereby acknowledged, it is mutually agreed by and between the parties hereto as follows:

I. **NAME**

The name of the limited liability company (the "Company") shall be "Trolley Pub of North Carolina, LLC."

II. **REGISTERED OFFICE AND AGENT**

The name of the registered agent of the Company shall be Jeff Murison. The registered office of the Company shall be located at 4743 Altha St., Raleigh, NC 27606.

III. **TERM**

The Company shall be perpetual.

IV. **ACCOUNTING METHOD AND FISCAL YEAR**

The Company shall keep its accounting records and shall report its income for income tax purposes on a method of accounting deemed appropriate by the Class A Members. The accounting for the Company shall be prepared so as to fully, accurately, and consistently report and reflect the operations of the Company and its financial condition. The Company shall utilize the Fiscal Year as June 1st through May 31st.

V. **INTERESTS AND CONTRIBUTIONS OF MEMBERS**

5.1 <u>Member Classes; Units</u>. There shall be Class A Members and Class B Members. Class A Membership interests in the Company will be represented by Class A Units that reflects a total contribution of cash, property or other things of value to the Company. Class B Membership interests will be represented by Class B Units which are issuable to employees of or consultants to the Company upon the exercise of a Class B Option or to other persons for such consideration as may be determined by the Board of Managers. Class A Members may vote, Class B Members may not.

5.1.1 <u>Class A Members</u>. The Class A Members are the members listed in Schedule A. Additional Class A Members may be admitted only in accordance with the provisions of this Agreement.

5.1.2 <u>Class B Members</u>. There are no current Class B Members. Class B Members

1

may be admitted only in accordance with the provisions of this Agreement.

    5.1.3   <u>Authorized Units</u>. The Company shall have authority to issue up to one million units, consisting of nine hundred thousand (900,000) Class A Units and one hundred thousand (100,000) Class B Units, subject to increase upon the unanimous approval of the Class A Members in the manner provided in Section 10 below. Reference herein to "Units" shall mean and include the Class A Units and the Class B Units.

    5.1.4.   <u>Class B Option Plan</u>. The Class A Members may adopt a "Class B Option Plan" for employees of the Company that will entitle them to acquire Class B Units at such exercise price and subject to such vesting schedule and other terms and conditions as may be included in such Class B Unit Option Plan. The Class B Unit Option Plan may impose such restrictions and limitations on the rights of the holders of such options and the Units to be issued upon the exercise thereof as may be determined by Majority Vote of the Class A Members. The members agree that, should the Company decide to create an option plan, the units to create the option pool would come from Kaapro & Cole Ventures, LLC's share, and those units in the option pool would become Class B units. The first Option Plan shall be the Option Plan under the terms listed in Schedule D.

    5.1.5   <u>Profits Interests</u>. Class B Units may, in the discretion of the Board of Managers, be issued as Units intended to constitute "profits interests", as defined in IRS Revenue Procedures 93-27 and 2001-43 ("Profits Interests") and the provisions of this Agreement relating to such Class B Units shall be interpreted consistent with such intent. Class B Units issued as profits interests shall have the same terms as other Class B Units except that the purchase price and initial Capital Accounts (as defined below) associated with such Class B Units shall be zero dollars ($0) and no distributions shall be made in respect of such Class B Units that would cause a holder thereof to have an Adjusted Capital Account Deficit (after taking into account all allocations and other Capital Account adjustments made or expected to be made for the year of such distribution). Reference herein to "Class B Units" shall refer to and include Class B Units having an initial Capital Account and those issued as Profits Interests.

    5.2   <u>Initial Member/Contributions</u>. The name and present mailing address of each member and the percentage interest of each member of the Company are set forth on the last page of this Agreement and on Schedule A hereto. Jeff Murison shall contribute $40,000 cash to the venture, in exchange for 250,000 Class A Units in the Company. Kaapro & Cole Ventures, LLC, shall contribute the intellectual property, trade secrets, business plans and commitments listed in Schedule B in exchange for 650,000 Class A Units in the Company.

    5.3   The initial contribution of each member shall be contributed to the Company upon execution of these Articles by such member, except that Jeff Murison shall contribute his capital to the Company according to Schedule C.

    5.4   An individual capital account shall be maintained for each member. The capital account of each member shall consist of such member's initial contribution, increased by:

        (a)   additional contributions made by such member, and

        (b)   such member's share of the Company's net profits,

and decreased by:

        (i)   distributions made to such member, and

2

     (ii) such member's share of the Company's losses,

all in accordance with any applicable provision of the Internal Revenue Code of 1986, as amended (the "Code"), or any rule or regulation thereunder.

 5.5 No additional contributions have been agreed to as of the date of these articles, and none shall be required or permitted without the unanimous written consent of all the Class A Members.

 5.6 Except as otherwise provided in this Agreement, a member shall not receive from the Company any part or all of his or her contribution to capital until:

  (a) all liabilities of the Company, except liabilities to members on account of their contributions to capital, have been paid or there remains property of the Company sufficient to pay them;

  (b) the consent of all Class A Members is had, unless the return of the contribution to capital may be rightfully demanded as provided herein; and

  (c) the Articles of Organization or these Articles are cancelled or so amended as to set out the withdrawal or reduction of the contributions of capital.

 5.7 A member may rightfully demand the return of his or her contribution only upon the dissolution of the Company.

 5.8 The Company shall have the discretion to distribute cash, notes, property or a combination thereof to a member in return for his or her contribution to capital as it deems appropriate.

## VI. ALLOCATION OF PROFITS AND LOSSES

 6.1 The profits and losses of the Company shall be determined for each fiscal year of the Company in accordance with the accounting methods followed for federal income tax purposes and otherwise in accordance with generally accepted accounting principles and procedures applied in a consistent manner and shall be deemed to have been earned ratably during the fiscal year. For purposes of Sections 702 and 704 of the Code or the corresponding sections of any future internal revenue law or any similar tax law of any state or jurisdiction, and for such purposes only, the determination of each member's distributive share of all items of income, gain, deduction, loss, credit or allowance for any period or year shall be made in proportion to the amounts of the members' respective percentage interests in the Company during such period or year.

 6.2 The profits of the Company shall be shared among the members in proportion to each member's respective sharing percentage in the Company as reflected by the member's respective unit ownership relative to the total amount of units, and the losses of the Company shall be borne by the members in proportion to each member's respective sharing percentage in the Company as reflected by the member's respective unit ownership relative to the total amount of units. Under no circumstances shall an allocation result in a requirement for a member to contribute additional capital to the Company.

## VII. DISTRIBUTIONS

 7.1 To the fullest extent allowed by the North Carolina Company Act (the "Act"), the Net Cash Flow, if any, of the Company shall be distributed at least quarterly among the members in proportion to each member's respective percentage interest in the Company. For such purpose, "Net Cash

3

Flow" shall mean:

(a) For each period, all cash income and receipts of whatsoever nature or kind received by the Company less all costs and expenses incurred or paid by, and all net additions to reserves of, the Company (whether operating or capital costs, and including without limitation, all costs to acquire its interest in the real property described in Article 3, payments upon the principal of any indebtedness, secured or unsecured, of the Company, expenditures for capital improvement, additions or replacements and any other expenditures which are not deductible in arriving at the Company's federal taxable income, such as expenses for repairs and reserves to meet anticipated expenses as the Class A Members shall deem to be reasonably necessary); plus

(b) Any other funds deemed by the Class A Members to be available for distribution.

7.2 Notwithstanding Sections 6 and 7.1, until Jeff Murison recoups his initial contribution of $40,000 in total distributions, Murison shall receive at least 75% of all distributions. After Jeff Murison receives an accumulated total of $40,000 in distributions, Sections 6 and 7.1 shall apply as written. Accordingly, a "Preference Balance" shall be maintained for Jeff Murison until it reaches zero reflecting the amount of his initial investment less the distributions he has received.

## VIII. MANAGEMENT

The Company shall be member-managed by the Class A Members. Kaapro & Cole Ventures, LLC, shall be responsible for the day-to-day operations of the Company. Kai Kaapro and Andrew Cole shall be the managing partners responsible for Kaapro & Cole Ventures, LLC's responsibilities, unless the Class A Members agree otherwise. Jeff Murison shall be responsible for local business relations, general support and crisis management when necessary. The Company may appoint individuals to serve as officers of the Company, with all the ordinary rights associated with such positions.

## IX. LEGAL TITLE TO PROPERTY

Legal title to all or any portion of the property of the Company shall be held in the name of "Trolley Pub of North Carolina, LLC" or, to the extent allowed by the Act, in such other name as the Company, in its sole discretion, shall determine to be in the best interest of the Company. Without limiting the foregoing grant of authority, to the extent permitted by the Act, the Class A Members may arrange to have title taken and held in its own name or in the names of trustees, nominees or straw parties for the Company. It is expressly understood and agreed that the manner of holding title to the property (or any part thereof) of the Company is solely for the convenience of the Company, and that all such property shall be treated as property of the Company, subject to the terms of these Articles.

## X. RIGHTS AND POWERS OF MEMBERS

10.1 The Class A Members of the Company shall have the authority to amend these Articles provided that any such amendment shall have received the consent of those members whose aggregate percentage interests in the Company exceed fifty percent (50%) of the total percentage interests of all members of the Company and the agreement of a majority in number of the Class A Members. A sale, exchange, lease, mortgage, pledge or other transfer of any substantial assets of the Company shall require consent of members whose aggregate percentage interests in the Company exceed seventy-five percent (75%) of the total percentage interests of all members of the Company.

10.2 Meetings of the Company for any purpose shall be held at the call of the members. All such meetings shall be held at a place designated by the members, and notice of such location and of the

date and time of the meeting shall be given by the members to each member at least ten (10) days prior to such date (unless such notice is waived as to any member, by such member).

10.3 The Class A Members of the Company shall have the right and the power to admit additional members upon the unanimous consent of all of the then members.

10.4 Class A Members have the right to vote, by majority of voting units, on all issues related to the Company. There shall be 100 voting units. The allocation of voting units shall be distributed in the following manner:

| Class A Member | Voting Units |
| --- | --- |
| Kaapro & Cole Ventures, LLC | 50 |
| Jeff Murison | 50 |

## XI. TRANSFERABILITY AND REDEMPTION OF INTERESTS

11.1 Except as otherwise provided, none of the members of the Company shall have the right to transfer or assign any part or all of their interest in the Company, and any purported transfer or assignment shall be void and of no force or effect, and may be ignored by the Company and its members. If all members of the Company other than the member proposing to dispose of his or her interest do not approve of the proposed transfer or assignment by unanimous written consent, the transferee of the member's interest shall have no right to participate in the management of the business and affairs of the Company or to become a member. In that event, the transferee shall only be entitled to receive the share of profits or other compensation by way of income and the return of contributions, to which that member otherwise would be entitled.

11.2 In the event of an assignment, the Company shall, upon the unanimous written consent of all remaining Class A Members, continue with respect to the remaining members; appropriate adjustments shall be made to their capital accounts and percentage interests to reflect the assignment of the interest of the assignor member; and an election may be made by the members, in its sole discretion, to adjust the basis of assets of the Company.

11.3 Notwithstanding any other provision in this Agreement, no transfer or assignment of all or any portion of a member's interest in the Company shall be effective, unless the transferor or assignor delivers to the Company a written opinion of counsel acceptable to the Company, to the effect that:

(a) such transfer or assignment, when added to the total of all other transfers and assignments of interest in the Company within the preceding twelve (12) months, would not result in the Company being considered to have terminated within the meaning of Section 708 of the Code;

(b) such transferor assignment would not violate the Securities Act of 1933, as amended, or any state securities of "Blue Sky" laws applicable to the Company or the interest to be transferred or assigned; and

(c) such transfer or assignment would not cause the Company to lose its status as a partnership for federal income tax purposes, result in a nonexempt "prohibited transaction" as defined under Section 4975 of the Code, with respect to the Company or any of its members or members or cause the Company to be subject to registration as an investment company under the Investment Company Act of 1940.

5

11.4  Each transferor or assignor and each transferee or assignee agrees that it will pay all reasonable expenses, including attorneys' fees, incurred by the Company in connection with a transfer or assignment of all or any portion of such transferor's or assignor's interest in the Company being transferred to such transferee or assignee.

11.5  A person who is the transferee or assignee of all or any portion of the interest of a member as permitted hereby but does not become a substituted member and who desires to make a further transfer or assignment of all or any portion of such interest, shall be subject to all of the provisions of this Article 13 to the same extent and in the same manner as any member desiring to make a transfer or assignment of all or any portion of its interest.

XII.  DISSOLUTION

12.1  The Company shall be dissolved upon the occurrence of any of the following events:

(a)  by the unanimous agreement of all Class A Members, which shall be in writing;

(b)  when required by law

12.2  As soon as possible following the occurrence of any of the events specified in this Article affecting the dissolution of the Company, the Company shall execute and file, with the Secretary, articles of dissolution in accordance with Sections 35-15 and 35-20 of the Act and in such form as shall be prescribed by the Secretary.

12.3  Upon the dissolution of the Company, the assets thereof shall be liquidated, and the proceeds therefrom, together with assets distributed in kind to the extent sufficient therefor, shall be applied and distributed in order of priority as follows:

(a)  First, to creditors of the Company, including members who are creditors, in the order of priority provided by law, in satisfaction of liabilities of the Company other than liabilities for distribution to members under Section 25-1 or Section 25-10 of the Act;

(b)  Second, to members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(c)  Third, to members of the Company in respect of their contributions to capital.

12.4  The members of the Company shall not be personally liable for the return or repayment of all or any portion of the contributions of any member; any such return or repayment shall be made solely from assets of the Company.

XIII.  BANK ACCOUNTS

The funds of the Company shall be deposited in such bank account or accounts as the members shall deem appropriate, in its sole discretion, and the Class A Members shall arrange for the appropriate conduct of such accounts.

XIV.  MISCELLANEOUS PROVISIONS

14.1  Unless otherwise provided in these Articles, no member shall be liable to any other member or to the Company for any good faith act or omission to act in the exercise of his or her judgment

6

under the provisions of these Articles.

14.2   Nothing herein contained shall be construed to constitute any member hereof the agent of any other member or to limit in any manner the members in the carrying on of their own respective business or activities.

14.3   These Articles set forth all (and are intended by all parties hereto to be an integration of all) of the covenants, promises, agreements, warranties and representations among the parties hereto with respect to the Company, the business of the Company and the property of the Company, and there are no covenants, promises, agreements, warranties or representations, oral and written, express or implied, among them other than as set forth herein.

14.4   Nothing contained in these Articles shall be construed as requiring the commission by any person of any act contrary to applicable law, including, without limitation, Section 4975 of the Code (to the extent applicable). Wherever there is any conflict between any provision of these Articles and any statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such manner that the provision(s) of these Articles thus affected shall be curtailed and limited only to the extent necessary to conform with said requirement of law. In the event that any part, section, paragraph or clause of these Articles shall be held to be indefinite, invalid or otherwise unenforceable, the entire Articles shall not fail on account thereof, and the balance of the Articles shall continue in full force and effect.

14.5   The Company shall indemnity, defend and save harmless each member or former member of the Company against expenses actually and reasonably incurred by him, her or it in connection with the defense of an action, suit or proceeding, civil or criminal, in which he, she or it is made a party by reason of being or having been such member, except in relation to matters as to which he, she or it shall be adjudged in the action, suit or proceeding to be liable for gross negligence or willful misconduct.

## XIV.   GOVERNING LAW

It is the intention of the parties hereto that these Articles shall be governed by and construed and enforced in accordance with the internal laws of the State of North Carolina.

## XV.   BURDEN AND BENEFIT

These Articles are binding upon and shall inure to the benefit of the parties hereto and their respective heirs, guardians, executors, administrators, personal and legal representatives, and successors and to the assigns of the parties hereto to the extent, but only to the extent, the same is provided for in accordance with, and permitted by, the provisions of these Articles.

## XVI.   NOTICES

Except as otherwise provided in these Articles, any notice, consent or other communication required or permitted hereunder shall be in writing and shall be addressed, in the case of the Company, to its principal place of business specified in Article 2, in the case of the members, to its office at the location specified in Article 9.1, and, in the case of any member, to its address set forth opposite its signature below, as specified on or to such other address or person as any of the foregoing parties shall furnish to the other parties in writing; and any such communication so addressed shall be deemed to have been given when delivered by hand or on the earlier of actual receipt and three (3) business days after being sent by registered or certified mail, postage prepaid, return receipt requested, or one (1) business

7

day after being sent by overnight courier, telegram, or cable or on actual receipt after being sent by any means not specified herein.

IN WITNESS WHEREOF, the parties have executed these Articles as of the day and year first above written.

Address: 3229 W Wyoming St
         Tucson, AZ 85719

Name printed: Kai Kaapro, on behalf of Kaapro & Cole Ventures, LLC

Address: 4743 Altha St.
         Raleigh, NC 27606

Name printed: Jeff Murison

8

## Schedule A

### CapTable (undiluted)

| MEMBER | CAPITAL ACCT | CLASS A UNITS | CLASS B UNITS | OWNERSHIP % | VOTING % | SH % | PREF BALANCE |
|---|---|---|---|---|---|---|---|
| Kaapro & Cole Ventures, LLC | $0 | 650,000 | 0 | 72.22% | 50% | 25% | $0 |
| Jeff Murison | $40,000 | 250,000 | 0 | 27.78% | 50% | 75% | $40,000 |
| Class B Options (100,000 auth) | $0 | 0 | 0 | 0% | 0% | 0% | $0 |
| | $40,000 | 900,000 | 0 | 100% | 100% | 100% | $40,000.00 |

### CapTable (fully diluted)

| MEMBER | CLASS A UNITS | CLASS B UNITS | OWNERSHIP % | VOTING % | SH % |
|---|---|---|---|---|---|
| Kaapro & Cole Ventures, LLC | 650,000 | 0 | 65% | 50% | 65% |
| Jeff Murison | 250,000 | 0 | 25% | 50% | 25% |
| Class B Options | 0 | 100,000 | 10% | 0% | 10% |
| | 900,000 | 100,000 | 100% | 100% | 100% |

## Schedule B

### Kaapro & Cole Ventures, LLC Contributions

- Trolley Pub logo
- Trolley Pub trademark
- Trolley Pub image and branding
- Know-how
- Marketing Plans
- Technical information
- Supplier lists and information
- Financial plans
- Contractor and builder information
- Business plans
- Management commitment
- Software
- Design work

## Schedule C

## Capitalization Plan

Jeff Murison shall capitalize the bank account according the following schedule:

| Date | Deposit |
|---|---|
| 3/1/2012 | $16,000.00 |
| 4/1/2012 | $4,100.00 |
| 5/1/2012 | $4,100.00 |
| 6/1/2012 | $4,100.00 |
| 7/1/2012 | $4,100.00 |
| 8/1/2012 | $4,100.00 |
| 9/1/2012 | $3,500.00 |
| | |
| Total | 40,000.00 |

Schedule C shall be subject to the following term:

If in the course of the Capitalization Plan

    (a) the Company's current assets should exceed it's current liabilities,
    (b) and if the difference between the Company's current assets and current liabilities exceeds $5,000, then

Jeff Murison will not be required to make the additional scheduled capital payments. This will not affect Jeff Murison's ownership in the Company, however, his preference account will be reduced by the amount he will no longer be obligated to pay.

## Schedule D

### Trolley Pub of North Carolina, LLC

### 2012 Equity Incentive Plan

This Equity Incentive Plan (the "**Plan**") is intended to encourage ownership of Class B Units (the "**Units**"), of Trolley Pub of North Carolina, LLC, a North Carolina limited liability company (the "**Company**") by its key employees by the grant of options in order to attract, motivate and retain outstanding individuals, to align their interests with those of the Company's Members, and to provide them with appropriate compensation and additional incentives, all to promote the success of the Company.

1. **Administration of the Plan.**

The administration of the Plan shall be under the general supervision of the Class A Members (the "**Administrator**"), who shall, within the limits of the Plan, determine the persons ("**Participants**") to whom and the times at which Options shall be granted. The Administrator may establish such rules as it deems necessary for the proper administration of the Plan, make such determinations and interpretations with respect to the Plan, and the Options granted under it, as may be necessary or desirable, and may include such further provisions or conditions in such Options as it deems advisable.

2. **Units Subject to the Plan.**

   (a) Number and Type of Units. The aggregate number of Units of the Company that may be issued pursuant to Options granted under the Plan is 100,000 Class B Units.

   (b) Restoration of Units. Units subject to an Option that expires, is terminated unexercised, is forfeited for any reason, or is settled in a manner that results in fewer Units outstanding than were initially awarded and Units surrendered in payment of the Option Price or any tax obligation with respect to an Option shall again be available for granting Options under the Plan to the extent of such expiration, termination, forfeiture, surrender or settlement.

3. **Options.**

   (a) Grants. Options may be granted from time to time by the Administrator to employees of the Company or of any parent or subsidiary company of the Company, and may also be granted to non-employee directors and consultants of the Company or any such other company.

   (b) Date of Grant. The date of grant for each Option shall be the date on which it is approved by the Administrator, or such later date or conditions as the Administrator may specify.

   (c) Option Price. The price at which Units may from time to time be purchased (the "Option Price") under each Option shall be determined by the Administrator. The Administrator may in its discretion permit the Option Price to be paid in whole or in part by a note or in installments or with Units of the Company or such other lawful consideration as the Administrator may determine.

12

(d) <u>Term of Option; Exercisability.</u> The Administrator shall determine the term of all Options, the time or times that Options become exercisable and whether they become exercisable in installments.

(e) <u>Effect of Disability, Death or Termination of Employment.</u> The Administrator shall determine the effect on an Option of the disability, death, retirement or other termination of employment of a Participant and the extent to which, and the period during which, the Participant's estate, legal representative, guardian or beneficiary on death may exercise rights thereunder. Any beneficiary on death shall be designated by the Participant, in the manner determined by the Administrator, to exercise rights of the Participant in the case of the Participant's death.

(f) <u>Form of Options.</u> Options granted hereunder shall be evidenced by an instrument delivered to the Participant specifying the terms and conditions thereof and containing such other terms and conditions not inconsistent with the provisions of the Plan as the Administrator considers necessary or advisable to achieve the purposes of the Plan or comply with applicable tax and regulatory laws and accounting principles. The form of Options may vary among Participants; provided that, in the absence of a specific determination in any particular case, the form of Option shall be as set forth in Exhibit A hereto.

(g) <u>Amendment or Termination of Options.</u> The Administrator may amend, modify, or terminate any outstanding Option. Any such action shall require the Participant's consent unless:

   i. in the case of a termination of, or a reduction in the number of Units issuable under, an Option, any time period relating to the exercise of such Option or the eliminated portion, as the case may be, is waived or accelerated before such termination or reduction (and in such case the Administrator may provide for the Participant to receive cash or other property equal to the net value that would have been received upon exercise of the terminated Option or the eliminated portion, as the case may be); or

   ii. in any other case, the Administrator determines that the action, taking into account any related action, would not materially and adversely affect the Participant.

(h) <u>Non-transferability of Options.</u> An Option shall not be transferable by the holder thereof otherwise than, in the case of an individual, by will or the laws of descent and distribution, and shall be exercisable, during the holder's lifetime, only by the holder. The Administrator may waive this restriction in any particular case.

(i) <u>No Rights as a Member.</u> No Participant or any person claiming through a Participant shall have any rights as a Member with respect to any Units to be distributed under the Plan until he or she becomes the holder thereof.

4. **No Right to Employment.**

No person shall have any claim or right to be granted an Option, and any grant of an Option shall not be construed as giving the Participant the right to continued employment. The Company expressly

13

reserves the right at any time to dismiss a Participant free from any liability or claim under the Plan.

5. **Operating Agreement; Other Conditions.**

As a condition for exercise of an Option, each Participant shall execute a Joinder Agreement pursuant to which such Participant shall become a party to the Company's Operating Agreement. Upon request, and in any event upon the exercise of an Option, the Company shall provide a copy of the Operating Agreement to the Participant.

6. **Withholding.**

The Participant shall pay to the Company, or make provision satisfactory to the Administrator for payment of, any taxes required by law to be withheld in respect of any Option no later than the date of the event creating the tax liability. In the Administrator's discretion, such tax obligations may be paid in whole or in part in Units, including Units retained from the exercise of the Option creating the tax obligation, valued at the fair market value of the Units on the date of delivery to the Company as determined in good faith by the Administrator. The Company and any of its affiliates may, to the extent permitted by law, deduct any such tax obligations from any payment of any kind otherwise due to the Participant.

7. **Amendment or Termination.**

The Administrator may amend or terminate the Plan at any time, subject to such approval of the Members as the Administrator shall deem necessary or advisable.

8. **Governing Law.**

The provisions of the Plan shall be governed by and interpreted in accordance with the laws of the State of North Carolina

Approved and adopted by the Members as of _____, 2012

_____  _____
Kai Kaapro,                                                              Jeff Murison

On behalf of Kaapro & Cole Ventures, LLC

*Exhibit A -- Form of Option*

2012 Option No ___                                                              _____Units

**Trolley Pub of North Carolina, LLC**
2012 Equity Incentive Plan
Nonstatutory Unit Option Certificate

Trolley Pub of North Carolina, LLC, a North Carolina limited liability corporation (the "Company"), hereby grants to the person named below ("Optionee") an option to purchase Units of the Company (the "Option") under and subject to the Company's 2012 Equity Incentive Plan (the "Plan") exercisable on the following terms and conditions and those set forth on the reverse side of this certificate:

Name of Optionee:

Optionee Address:

Number of Class B Units:

Option Price:

| | |
|---|---|
| Conditions of Vestment: | Company reaches $55,000 in accumulated net earnings |
| Exercisability: | Upon vestment |
| Expiration Date: | Three years from vestment date |

By acceptance of this Option, Optionee agrees to the terms and conditions set forth in this Agreement and in the Plan.

OPTIONEE                                          Trolley Pub of North Carolina, LLC

                                                  By: _____
_____

Name:                                             Name:
                                                  Title:

## Option Terms and Conditions

1. <u>Plan Incorporated by Reference.</u> This Option is issued pursuant to the terms of the Plan and may be amended as provided in the Plan. Capitalized terms used and not otherwise defined in this certificate have the meanings given to them in the Plan. This certificate does not set forth all of the terms and conditions of the Plan, which are incorporated herein by reference. The Administrator administers the Plan and its determinations regarding the interpretation and operation of the Plan are final and binding. Copies of the Plan may be obtained upon request without charge from the Company.

2. <u>Option Price.</u> The price to be paid for each Unit issued upon exercise of the whole or any part of this Option is the Option Price set forth on the face of this certificate.

3. <u>Exercisability Schedule.</u> This Option may be exercised at any time and from time to time for the number of Units and in accordance with the exercisability schedule set forth on the face of this certificate, but only for the purchase of whole Units. This Option may not be exercised as to any Units after the Expiration Date.

4. <u>Method of Exercise.</u> To exercise this Option, Optionee shall deliver written notice of exercise to the Company specifying the number of Units with respect to which the Option is being exercised accompanied by payment of the Option Price for such Units in cash, by certified check or in such other form, including Units of the Company valued at their fair market value on the date of delivery, as the Administrator may approve. In connection with any purchase of Units pursuant to an exercise of this Option, Optionee shall execute a Notice of Exercise in a form acceptable to the Company and shall become a party to the Company's Operating Agreement, as such Operating Agreement may be amended from time to time, by execution of a Joinder Agreement in the form attached to the Operating Agreement as Exhibit A.

5. <u>Rights as a Member or Employee.</u> Optionee shall not earn the right to exercise or obtain the value of any portion of this Option except as provided in the exercisability schedule and until such time as all the conditions set forth herein and in the Plan that are required to be met in order to exercise this Option have been fully satisfied. No portion of this Option shall be deemed compensation for past services before it has become exercisable in accordance with the exercisability schedule. Optionee shall not have any rights in respect of Units as to which the Option shall not have been exercised and payment made as provided above. Optionee shall not have any rights to continued employment or other service by the Company or its affiliates by virtue of the grant of this Option.

6. <u>Recapitalization, Mergers, Etc.</u> As provided in and subject to the Plan, in the event of a merger, recapitalization or other transaction involving the Company, the Administrator may in its discretion take certain actions affecting the Option and Optionee's rights hereunder, including without limitation adjusting the number and kind of securities subject to the Option and the exercise price hereunder, providing for another entity to assume the Option, making provision for a cash payment, and terminating the Option.

7. <u>Option Not Transferable.</u> Unless otherwise determined by the Administrator, this Option is not transferable by Optionee otherwise than by will or the laws of descent and distribution, and is exercisable, during Optionee's lifetime, only by Optionee.

8. <u>Exercise of Option after Termination of Employment.</u> If Optionee is an employee of the Company, if Optionee's employment with (a) the Company, (b) an Affiliate, or (c) a corporation (or parent or subsidiary corporation of such corporation) issuing or assuming a option in a transaction to which

section 424(a) of the Internal Revenue Code of 1986, as amended (the "Code") applies, is terminated for any reason other than by disability (within the meaning of section 22(e)(3) of the Code) or death, Optionee may exercise only the rights that were available to Optionee at the time of such termination and only within ninety (90) days from the date of termination. If Optionee's employment is terminated as a result of disability, such rights may be exercised only within one (1) year from the date of termination. Upon the death of Optionee, his or her designated beneficiary or legal representative shall have the right, at any time within one (1) year after the date of death, to exercise in whole or in part any rights that were available to Optionee at the time of death. Notwithstanding the foregoing, no rights under this Option may be exercised after the Expiration Date.

9. <u>Exercise of Option after Termination of Consulting Relationship/Services Engagement.</u> If Optionee is not an employee of the Company, if Optionee's consulting relationship or other services engagement with the Company or any of its affiliates is terminated for any reason, Optionee or Optionee's legal representative may, subject to the terms of the agreement governing Optionee's services to the Company, exercise only the rights that were available to Optionee at the time of such termination and only within ninety (90) days from the date of termination. Notwithstanding the foregoing, no rights under this Option may be exercised after the Expiration Date.

10. <u>Compliance with Securities Laws.</u> It shall be a condition to Optionee's right to purchase Units hereunder that the Company may, in its discretion, require that (a) in the opinion of counsel for the Company, the proposed purchase shall be exempt from registration under the Securities Act of 1933, as amended (the "Act"), and Optionee shall have made such undertakings and agreements with the Company as the Company may reasonably require, and (b) that such other steps, if any, as counsel for the Company shall consider necessary to comply with any law applicable to the issue of such Units by the Company shall have been taken by the Company or Optionee, or both. The certificates representing the Units purchased under this Option may contain such legends as counsel for the Company shall consider necessary to comply with any applicable law.

11. <u>Payment of Taxes.</u> Optionee shall pay to the Company, or make provision satisfactory to the Company for payment of, any taxes required by law to be withheld with respect to the exercise of this Option. The Administrator may, in its discretion, require any other Federal or state taxes imposed on the sale of the Units to be paid by Optionee. In the Administrator's discretion, such tax obligations may be paid in whole or in part in Units, including Units retained from the exercise of this Option, valued at their fair market value on the date of delivery. The Company and its affiliates may, to the extent permitted by law, deduct any such tax obligations from any payment of any kind otherwise due to the Optionee.