IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| THOMAS LAPHAM, ) | |
| ) | |
| Plaintiff, ) | Civil No. 1:16-cv-469 |
| ) | |
| v. ) | Hon. Liam O'Grady |
| ) | |
| TROLLEY PUB OF NORTH CAROLINA, ) | |
| LLC, et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

In 2012, Thomas Lapham began investing in a nationwide trolley pub business venture. After a few years of unsuccessfully attempting to grow the business, Lapham became dissatisfied with the venture and, after a dispute arose, he sued his partners on theories of fraud and breach of contract. Lapham's initial complaint was dismissed without prejudice, and he filed an amended complaint on June 13, 2016. (Dkt. No. 12). Defendants then filed this motion to dismiss pursuant to Rule 12(b)(6). (Dkt. No. 13). For the reasons discussed below, this motion is hereby **GRANTED**.

### I. BACKGROUND

#### A. Allegations in the Complaint

On February 29, 2012, Jeff Murison and Kaapro & Cole Ventures, LLC ("K&C")—owned by Andrew Cole and Kai Kappro—executed an Operating Agreement for Trolley Pub of North Carolina, LLC ("TPNC"). K&C was "organized for the purpose of managing businesses that operate pedal-powered trolley tours in several locations throughout the United States," and

1

TPNC "was organized for the purpose of operating pedal-powered trolley tours in Raleigh, North Carolina." Pursuant to the Operating Agreement, Murison would contribute $40,000 in return for a 27.78% ownership interest, and K&C would contribute the Trolley Pub logo, Trolley Pub trademark, Trolley Pub image and branding, know-how, marketing plans, technical information, supplier lists and information, financial plans, contractor and builder information, business plans, management commitment, software, design work in return for a 72.22% ownership interest.

In late 2012 and early 2013, Thomas Lapham, Kaapro, and Cole "discussed joining together to build and operate a business offering pedal-powered tours of bars in cities and towns across the United States." These discussions included a phone conversation on February 1, 2013, in which they discussed opening a pub trolley business in Virginia, Maryland, DC, and Delaware. Lapham alleges that Kaapro and Cole made three promises during this phone call: (1) to provide Lapham with a 50% ownership interest in VA, MD, DC, and DE; (2) to contribute the Trolley Pub trademark, logo, branding, know-how, marketing plans, technical information, supplier information, financial and business plans, contractor and builder information, and software and design work (together, the "Trolley Pub Intangible Property") to the Trolley Pub Business; and (3) operate the Trolley Pub Business in VA, MD, DC, and DE. In return for these promises, Lapham promised to provide capital for the business. Latham alleges that a partnership or joint venture was formed as a result of these mutual promises.

On February 4, 2013, Lapham and TPNC executed a Memorandum of Terms for a Proposed Business Partnership Agreement. In it, they "agree[d] to create a Virginia Limited Liability Company entitled 'Trolley Pub of Virginia, LLC' which will engage in a business according to the business model discussed over the past month." Lapham would contribute $60,000 in exchange for a 50% ownership interest and TPNC would contribute "the listed

2

intellectual property, trade secrets, business knowhow/plans and perpetual commitments" in return for a 50% ownership interest. The agreement contained the following language regarding the intellectual property:

> Intellectual Property developed in the course of the Venture is the property of the Venture. [TPNC's] Intellectual Property that is contributed to the Venture is licensed to the Venture and may only be used in conjunction with the course of business of the Venture. Licensed Intellectual Property is nonassignable. The Company shall contribute the following Intellectual Property and Trade Secrets to the Venture:
>
> i. Trademark
> ii. Branding
> iii. Business Plans
> iv. Financial Models
> v. Strategies
> vi. Marketing, design,
> vii. Domain names
> Viii. Other TBD

The agreement was signed by Kai Kaapro, as Member/Managing Partner of TPNC, and Lapham.

For both the February Representations and the Partnership Agreement, Lapham alleges that Kaapro and Cole never had any intention of performing those promises, but instead that they intended to "maintain ownership and control of the Trolley Pub Intangible Property and grant rights in such property to a competing entity or entities in which Lapham had no interest but that would be authorized to operate the Trolley Pub Business in [VA, MD, DC, and DE], thereby diluting Lapham's promised 50% ownership." Lapham relied on these representations and invested "thousands of dollars" in the Trolley Pub Business through early March 2013.

On March 4, 2013, Kaapro met with Lapham in Virginia to discuss taking the Trolley Pub Business nationwide (with the exception of "Carolina"). Kaapro indicated that Lapham would be a 50% owner in the business, and that this would be a separate ownership from the

3

VTPB because he and Cole had a separate agreement with Murison and TPNC to include TPNC in the operation of the business within 250 miles of Raleigh, North Carolina. Latham agreed to provide capital to start and run the nationwide Trolley Pub Business, and he asserts that a partnership or joint venture was formed as a result. He also alleges that Kaapro never had any intention of performing those promises.

On March 15, 2013, Kaapro and TPNC proposed an Operating Agreement for Trolley Pub of Virginia, LLC ("TPV"). The agreement stated that Lapham would contribute $60,000 and own 50% and that TPNC "shall contribute the intellectual property, trade secrets, business plans and commitments listed in Schedule B in exchange for [50% of] the Company." Schedule B lists the Trolley Pub logo, Trolley Pub trademark, Trolley Pub image and branding, know-how, marketing plans, technical information, supplier lists and information, financial plans, contractor and builder information, business plans, management commitment, software, and design work. The agreement was signed by Kaapro but not by Lapham.

Again Lapham alleges that "at the time that these representations were made, neither Kaapro nor TPNC had the present intent to perform those promises." Further, he alleges that, "at the time that these representations were made, Kaapro and TPNC did not intend to contribute the [the intellectual property] to [the business] but only to permit [the business] to use that property, under certain conditions and in limited areas." These representations allegedly were made with the intent to induce Lapham into investing money. Based on the 2013 Representations, the partnership agreement, and the proposed TPV Operating Agreement, Lapham invested "at least $400,000" in the business between March 2013 and June 2015.

In May or June of 2014, Kaapro, Cole, K&C, and Lapham discussed forming a holding company to further the expansion of the business. A year later, in June 2015, Kaapro and K&C

proposed an Operating Agreement for Trolley Pub Holdings, LLC ("TPH"). Lapham would contribute $400,000 in exchange for 50% and K&C would contribute the Trolley Pub logo, Trolley Pub trademark, Trolley Pub image and branding, know-how, marketing plans, technical information, supplier lists and information, financial plans, contractor and builder information, business plans, management commitment, software, design work in exchange for 50%. The agreement was never executed by K&C or Lapham.

Again Lapham alleges that at the time these representations were made, Kaapro and K&C had no intention to perform because "all of the property that Kaapro and K&C promised in the TPH Operating Agreement . . . had already been contributed to TPNC by virtue of the [February 29, 2012] Operating Agreement" discussed above. Lapham relied on the representations in the proposed TPH Operating Agreement and invested "at least $12,000" in the business between June 1, 2015 and present.

On December 2, 2015, K&C and TPNC executed an Intellectual Property Assignment and License Back Agreement. Pursuant to the agreement, TPNC assigned K&C "all intellectual property rights" and K&C granted TPNC a perpetual license to use those rights in connection with its business. The license to use the intellectual property is exclusive in North Carolina, South Carolina, and Georgia, and non-exclusive outside of those states. Lanham alleges that the terms to the License Back Agreement made it impossible for Lapham to own 50% of a nationwide trolley pub business.

On December 15, 2015, K&C, Kaapro, and Cole communicated to Lapham that they would not contribute the intellectual property as promised, and that they never intended to do so because they had previously contributed it to TPNC.

### B. Procedural Background

Lapham filed a complaint in Fairfax County Circuit alleging ten counts fraud and breach of contract. Defendants removed to this Court on the basis of diversity jurisdiction. (Dkt. No. 1). Defendants filed their first motion to dismiss on May 4, 2016. (Dkt. No. 4). This court granted leave to amend the complaint and dismissed the previous motion as moot. (Dkt. No. 11). Plaintiff filed an amended complaint on June 13, 2016. (Dkt. No. 12). Defendants now move to dismiss for failure to state a claim under Rule 12(b)(6). (Dkt. No. 13). Lapham has opposed the motion. (Dkt. No. 18). The Court heard arguments on the motion on September 9, 2016.

## II. LEGAL STANDARD

In considering a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, construing them in the light most favorable to the plaintiff. *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). To defeat the motion, the Plaintiff must allege enough allegations of fact "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In this regard, bald legal assertions without factual support need not be accepted. *Id.* Indeed, the Court may not rely on mere "labels and conclusions" or the Complaint's "formulaic recitation of the elements of a given cause of action in deciding the motion. *Id.* at 555.

## III. DISCUSSION

The Complaint alleges four separate legal theories for recovery: (1) Fraud; (2) Constructive Fraud; (3) Breach of Contract; and (4) Anticipatory Breach of Contract. After reviewing the parties' briefs and arguments, the Court concludes that none of these claims meet the threshold necessary to survive Defendants' motion to dismiss. In particular, the fraud claims fail because they do not properly allege a false statement. Similarly, the contract claims fail to

identify a legally binding contract was breached. The specifics of these claims will be addressed in turn below.[1]

### A. <u>Fraud and Constructive Fraud</u>

Counts I through VI are pled in the alternative: (1) fraud and constructive fraud against Kaapro and Cole (Counts I & IV); (2) fraud and constructive fraud against K&C (Counts II & V); and (3) fraud and constructive fraud against TPNC (Counts III & VI). In Virginia, fraud requires "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Brown v. HSBC Mortg. Corp.*, No. 1:10-cv-1427, 2011 WL 3101780, at *1 (E.D. Va. July 22, 2011) (citing *State Farm Mut. Auto. Ins. Co. v. Remley*, 618 S.E.2d 316, 321 (Va. 2005)). "[C]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Va. Natural Gas Co., Inc. v. Hamilton*, 249 Va. 449, 455 (1995) (citations and quotations omitted).

Constructive fraud, on the other hand, requires that "a false representation of a material fact [be] made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation." *Baker v. Elam*, 883 F. Supp. 2d 576, 580 (E.D. Va. 2012). All claims of fraud implicate Rule 9(b)'s heightened pleading standard. Thus, a complaint must allege "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

All of Lapham's fraud claims fail at the first element because the Complaint does not allege any facts that constitute a false representation. Throughout his pleading, Lapham asserts:

---

[1] Because the Court concludes that the claims fail against all Defendants, it does not address the arguments that may differ for Kaapro and Cole as individuals.

7

> At the time that the . . . promises were made, Kaapro and Cole had no intention to perform those promises . . . Instead, Kaapro and Cole intended to maintain ownership and control of the Trolley Pub Intangible Property and grant rights in such property to a competing entity or entities in which Lapham had no ownership interest but that would be authorized to operate the Trolley Pub Business in those states . . .

*See* Compl. ¶ 16. Lapham repeats some form of this language for each of the alleged promises Kaapro and/or Cole made to him in February 2013, March 2013, and June 2016. Thus, the Complaint argues that Defendants' professed intent to perform the promises was never genuine, and was therefore false. Without any facts to support this legal conclusion, however, the claims must fail.

In support of his argument, Lapham conflates the "intent to mislead" and "false representation" elements of fraud. Essentially, he argues that Defendants "intended to mislead" him, and therefore they made a "false representation." This argument overlooks the fact that the elements of fraud are separate and distinct. It is true that Rule 9(b)'s heighted pleading requirement is sometimes softened for the element of scienter. *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (internal citations omitted) ("[C]onclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive."). That holding, however, has no effect on the factual pleading requirement of Rules 12(b) and 9(b) as applied to the element of "false representation."

Aside from Lapham's conclusory allegations, there is nothing in the Complaint to suggest that Defendants did not intend to follow through on their promises. There is no allegation of side dealings with other companies, conspiracies, embezzlement, misstatements of bank records, misrepresentations of profitability, improper auditing procedures, or any of the other telltale signs of fraud. To the contrary, the Complaint suggests that all parties intended for this business relationship to endure. First, the parties signed a partnership memorandum in

8

February 2013. Next, Kaapro signed a TPV Operating Agreement in March of 2013 and offered it to Lapham for execution. Finally, the parties drafted a Proposed TPH operating agreement in June 2016. Far from indicating that Defendants never had any intention to fulfill their promises, these three separate documents suggest that they memorialized their discussions and tried to further the business relationship through additional written contracts. In light of this evidence, it is highly improbable that "Kaapro and Cole had no intention to perform these promises." As such, these allegations fall far short of the stringent pleading required by Rule 9(b).

This conclusion makes practical sense as well. Accepting Lapham's theory of fraud would transform every breach of contract case into a fraud case. Plaintiff essentially alleges that "Defendants had no intention of fulfilling their side of the bargain when they entered into it, and therefore they misstated a material fact." Without support for these alleged misrepresentations of intent, this is an assertion that every businessman could claim if his deal went awry. For example, if a merchant failed to deliver goods as required by contract, the buyer could claim that the seller did not deliver the merchandise, "and never had an intention to do so." This result would undercut the reasoning behind 9(b), which seeks to protect defendants from harm to their reputations as well as from frivolous lawsuits. *See Harrison*, 176 F.3d at 784. Thus, for good reason, the Fourth Circuit has declared that "[m]ere allegations of 'fraud by hindsight' will not satisfy the requirements of Rule 9(b). *Id.* As such, if Defendants did not fulfill their promises in a bargained-for exchange, the law of contracts, rather than the tort of fraud, will provide Plaintiff his relief.

2. **Breach of Contract and Anticipatory Breach of Contract**

Counts VII through X are also pled in the alternative: (1) breach of contract and anticipatory breach of contract against Kaapro and Cole (Counts VII & IX); and (2) breach of

9

contract and anticipatory breach of contract against K&C (Counts VIII & X). In Virginia, breach of contract requires "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004). Alternatively, to constitute an anticipatory breach, "it must appear that the party bound under a contract has unequivocally refused to perform, or, as the Supreme Court put it . . . there must be a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." *Yorktowne Shopping Ctr., LLC v. Nat'l Sur. Corp.*, No. 1:10-cv-1333, 2011 WL 2414389, at *7 (E.D. Va. June 15, 2011) (quoting *City of Fairfax v. Washington Metro. Area Transit Auth.*, 582 F.2d 1321, 1326 (4th Cir.1978)) (internal quotation marks omitted); *see also Lake Ridge Apartments, LLC v. Bir Lakeridge, LLC*, 335 F. App'x 278, 283 (4th Cir. 2009) ("The Virginia Supreme Court has held that for a repudiation of a contract to constitute a breach, the repudiation must be clear, absolute, and unequivocal, and must cover the entire performance of the contract." (quoting *Vahabzadeh v. Mooney*, 399 S.E.2d 803, 805 (1991)).

### 1. Lapham Does not Allege the Existence of a Contract Aside From the Partnership Memorandum.

It is not entirely clear from the face of the complaint which contract Lapham is alleging was breached. Lapham's Opposition Brief alleges that a "binding joint venture or partnership agreement was reached by the parties orally on February 1, 2013 . . . and amended on or about March 4, 2013." Opp'n at 25. Further, Lapham recites: "In return for Lapham providing funding for the Trolley Pub Business, K&C promised to provide all of the intangible property necessary to operate the business nationwide, with the exception of 'Carolina' (Including, the

Trolley Pub Intangible Property), and to give Lapham a 50% ownership interest in the nationwide . . . Trolley Pub Business."

Thus, Lapham is not alleging a breach of the executed partnership memorandum, the unexecuted TPV operating agreement, or the unexecuted TPH operating agreement. Instead, he appears to allege that an independent oral contract was formed prior to the execution of the partnership agreement. As Defendants correctly note, all of the contract claims require a threshold showing "that there was a valid contract to be breached." *Adkins v. Bank of Am., N.A.*, No. 1:14-CV-563 GBL/JFA, 2014 WL 3615876, at *4 (E.D. Va. July 18, 2014). "The essential elements of a contract are offer and acceptance, with valuable consideration." *Lawson & Frank, P.C. v. Bettius*, 2004 WL 3466347, at *4 (Va. Cir. Ct. 2004) (citing *Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980)). Further, "the formation of a contract requires a manifestation of mutual assent. The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or an acceptance." *Jones v. Holloway*, 73 Va. Cir. 46 (2007).

In this case, there are no facts alleged in the complaint that would constitute an offer, acceptance, or consideration creating an oral contract in 2013. Lapham refers to "discussions" and "promises" but he does not set forth facts that amount to offer and acceptance or the traditional bargained-for exchange. In his Opposition Brief, Lapham asserts that his promise to provide funding in exchange for K&C's promise to provide Trolley Pub's intangible property constituted sufficient consideration for a contract under Virginia law. However, both of these mutual promises are vague and indefinite and do not show a "manifestation of mutual assent." *Jones v. Holloway*, 73 Va. Cir. 46 (2007). This is particularly true given the fact that Lapham does not specify the amount of money that he was is obligated to contribute. *See Allen v. Aetna*

11

*Cas. & Sur. Co.*, 222 Va. 361, 364 (1981) (finding a contract vague for indefiniteness when "[n]o sum was specified in the agreement, nor was any method or formula alleged for determining the amount payable . . ."). Without this crucial term, it is unclear whether Lapham was obligated to pay $1 or $400,000, or some other figure. This lack of concrete obligation on Lapham's part strongly suggests that no contract was formed.

The terms surrounding the intangible property are similarly vague. As shown by the License Back Agreement and the Partnership Agreement, the parties' intangible property contracts are typically detailed and precise. In a separate schedule, they identify the specific pieces of intellectual property that will be provided, whether they will be licensed or assigned, and whether the license (if any) is exclusive, non-exclusive, or restricted by territory. None of these terms are included in the oral contract alleged by Lapham. Instead, he alleges that Defendants agreed "to provide all of the intangible property necessary to operate the business nationwide (with the exception of 'Carolina')." It is unclear what intangible property is referenced by this alleged contractual term. It is even less clear what the "necessary" property may be. Furthermore, there is no mention of a license, sub-license, assignment, or any other form of transfer. Finally, the inclusion of the term "Carolina" is ambiguous and contradicts the statement that the business would be "nationwide." As such, critical terms of the contract—the monetary contribution and the provision of intangible property—are simply not defined with any certainty. This absence of clarity and the indefiniteness of terms defeat Lapham's assertions of an oral contract.

Moreover, a written and definitive contract *draft* followed each of the oral contracts or contract amendments that Lapham alleges. In the case of the March 2013 TPV operating agreement, this was even signed by Kaapro. This suggests that the "promises" and "discussions"

that Lapham refers to were nothing more than contract negotiations. With regard to the oral contract from early 2013, it appears those discussions were memorialized and given effect on February 4, 2013, when the parties executed the Partnership Agreement. With regard to the "amendment" on or around March 4, it appears that those negotiations were embodied in the TPV agreement, which Lapham never executed and is therefore not legally binding. The fact that actual contract documentation was produced following the parties' negotiations suggests that the discussions that Lapham references were in fact preliminary negotiations, and not separate oral contracts, as alleged. Lapham cannot reject each of the draft agreements that were offered to him in definite terms, and then turn around and enforce the ambiguous negotiations of those documents as though they were valid contracts. Without contractual obligations on either side, there could be no breach, and therefore Lapham's claims must fail.

### 2. In the Alternative, Lapham Has Not Alleged a Breach

Even assuming *arguendo* that Lapham did have a valid oral contract with one or more of the Defendants, he has not identified a breach of these contracts, either anticipatory or otherwise. Lapham asserts that Defendants breached three promises to him: (1) to provide all the intangible property necessary to operate the business nationwide (with the exception of Carolina); (2) to give Lapham a 50% ownership interest in that nationwide business (with the exception of Carolina); and (3) to jointly control any nationwide business. The thrust of his argument relies on the License Back Agreement, which was executed between K&C and TPNC, and which permits TPNC to retain an exclusive right to the Trolley Pub intangible property in North Carolina, South Carolina, and Georgia and a non-exclusive right to use that property in other states. Thus, Lapham argues that he is not receiving the benefit of his bargain because it is

impossible for him to receive a 50% nationwide (with the exception of Carolina) ownership stake when the company may not operate in three states. This argument fails for at least three reasons.

First, the Partnership Agreement that Lapham signed with TPNC gave the joint venture a license to use the Trolley Pub intellectual property, not a right to own that property. *See* Compl. Ex. A at 3 ("The Company's Intellectual Property that is contributed to the Venture is licensed to the Venture and may only be used in conjunction with the course of business of the Venture."). The Venture was not given any ownership interest in this intellectual property, and Lapham has not identified facts showing that he bargained for any such interest. The only evidence in his favor is the unexecuted TPV agreement, which stated that TPNC would "contribute" the Trolley Pub Intellectual Property to the business in return for a 50% ownership interest. However, this contract was not signed, and Lapham cannot now reap the benefits of the agreement he rejected.

Second, there is no allegation of damages that flow from this alleged breach. It is important to remember that TPNC is a separate entity from the joint venture Lapham alleges, and Lapham is therefore not entitled to TPNC's profits. Moreover, Lapham has not alleged that he wished to expand the Trolley Pub business into South Carolina, North Carolina, and Georgia, where TPNC operates. Without allegations of an intention or attempt to run a business in that region, there can be no allegation of lost profits, lost business opportunities, or any other loss. The alleged damage in this case was supposedly Lapham's $400,000 contribution, which was intended to fund a "nationwide" business. However, any nationwide business would need to start somewhere, and it is not at all clear that Lapham and K&C had sought to pursue business in any region that overlaps with TPNC. Indeed, if the alleged joint venture between Lapham and K&C *had* wanted to expand into those states, there is no doubt that it could. Kaapro and Cole are the sole owners of K&C, and K&C is the controlling owner of TPNC. As such, the License

Back Agreement (or any other agreement) between K&C and TPNC could easily be amended at any time.[2] To expand the joint venture into Georgia, North Carolina, or South Carolina, Kaapro and Cole would only need to draft and sign an agreement to make it happen.

Finally, the "Carolina" exception undercuts Lapham's breach of contract claims. Lapham admits that he was aware of Kaapro and Cole's separate obligations "to include *TPNC* in the operation of any location of the Trolley Pub Business located within 250 miles of Raleigh, North Carolina." Compl. ¶ 23. Thus, he cannot argue with a straight face that he bargained for a stake in a truly nationwide business. Indeed, a 250 mile radius around Raleigh touches portions approximately seven separate states and the District of Columbia. Under the terms of his Complaint, therefore, recognition of the "Carolina" exception strongly undercuts any idea of a truly nationwide business.

### IV. CONCLUSION

In sum, because Lapham has not sufficiently alleged a valid contract, or any cognizable breach of contract, his claims must fail. Similarly, Lapham does not adequately allege a cognizable theory of fraud. Therefore, Defendants' motion to dismiss is hereby **GRANTED** and the amended complaint is **DISMISSED**. An appropriate order shall issue.

_____
Liam O'Grady
United States District Judge

December 12, 2016
Alexandria, Virginia

---

[2] This fact also undercuts Lapham's argument that failing to disclose the License Back Agreement constituted a material omission. If Kaapro and Cole could unilaterally alter the terms of that contract at any time, then the disclosure of that agreement cannot be material.